**IN THE COURT OF APPEALS OF IOWA**

No. 21-0002
Filed April 14, 2021

**IN THE INTEREST OF L.F.,**
**Minor Child,**

**C.F., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Story County, Stephen A. Owen,

District Associate Judge.

        The mother of L.F. appeals from the juvenile court order dismissing the

child-in-need-of-assistance action. **REVERSED AND REMANDED.**

        Christine E. Branstad of Branstad & Olson Law Office, Des Moines, for

appellant mother.

        Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellee State.

        Jesse A. Macro Jr. of Macro & Kozlowski, L.L.P., West Des Moines, for

father.

        Shannon M. Leighty, Nevada, attorney and guardian ad litem for minor

child.


        Considered by Vaitheswaran, P.J., Tabor, J., and Vogel, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2021).

**VOGEL, Senior Judge.**

The mother of L.F. appeals from the juvenile court order dismissing a child-in-need-of-assistance (CINA) action. We agree with the mother that the purposes of the CINA adjudication have not been accomplished and the child remains in need of juvenile court supervision. Therefore, we reverse and remand for further proceedings.

## I. Background Facts and Proceedings

L.F. was born in 2005. She has intellectual disabilities and functions at about a second-grade level. She needs at least occasional assistance dressing, bathing, and toileting. She cannot speak, but she can communicate limited concepts using an assistive electronic device or nonverbal signals.

The mother and father were previously married. They had four children together—two boys and two girls, L.F. and her older sister S.F.[1] The mother filed a petition for dissolution of marriage in February 2016. In October 2016, the mother contacted the Iowa Department of Human Services (DHS) to report she suspected the father sexually abused S.F. and L.F. As part of the investigation, the mother also reported she suspected the father sexually abused her female cousin K.S. DHS noted L.F., as a child with special needs, was "very vulnerable" and the father showed "very concerning sexualized behaviors," but DHS ultimately determined the allegation of abuse against S.F. and L.F. was not founded. In December 2017, the district court entered a decree that dissolved the parents'

---

[1] S.F. was a minor at the start of the CINA action, but she reached age eighteen before dismissal of the action.

marriage, granted joint legal custody, placed physical care with the mother, and ordered visitation with the father that included supervised overnight visits with L.F.[2]

The family again came to the attention of DHS in July 2018 when the mother reported a witness saw L.F.'s hand on the father's crotch over his clothes and the father did nothing to move or redirect L.F. The juvenile court soon ordered L.F. temporarily removed from her father's care. In September, DHS determined the allegation of abuse against L.F. was unfounded in light of an ongoing criminal investigation into the matter that limited the DHS investigation.[3] In October, the court entered a stipulated order finding L.F. was a child in need of assistance (CINA).

On November 26, 2018, the juvenile court held a dispositional hearing in which the mother submitted evidence of the father's prior alleged sexual misconduct. First, the mother testified that when S.F. was three years old, the father "accidentally" put his finger inside her vagina while bathing her. Second, the mother provided records from the father's conviction of a sex offense in Minnesota for a 2012 incident in which he fondled a female physician's breast during a medical appointment for one of the children. Third, K.S. provided a letter accusing the father of multiple incidents of sexual misconduct in or around 2007 when K.S. was fifteen years old and staying with the family. According K.S.'s letter, the father: encouraged K.S. to sit on his lap in a hot tub; stayed in and around K.S.'s room for an extended time right before she planned to undress to take a shower and go to

---

[2] The mother has since filed a petition to modify visitation. On December 13, 2019, the juvenile court authorized concurrent jurisdiction with the district court. Trial on the mother's petition to modify visitation is scheduled for April 2021.

[3] The criminal investigation did not result in charges.

sleep; and rode with K.S. on a four-wheeler and fondled her breasts when they were alone. Fourth, S.F., who was seventeen years old at the time of the hearing, provided a letter and testified to allegations the father engaged in sexual misconduct toward her. S.F. alleged the father: cuddled and spooned S.F. in bed and on the couch; frequently walked into the bathroom while S.F. was showering; looked down S.F.'s shirt and stared at her buttocks while she was bent over; and repeatedly pressed his body against hers as he walked past. Additionally, S.F. said the father continued bathing L.F. and told S.F. to lie and say she was bathing L.F.

On November 28, 2018, the juvenile court issued the dispositional order at issue here. The court found the father "has a very concerning history of . . . sexualized contact primarily involving minor females." The juvenile court noted there is no supporting evidence for the allegations of sexual misconduct presented at the hearing—other than the Minnesota incident that resulted in conviction—but the court specifically found the father groped K.S. and digitally penetrated S.F.'s vagina. The court also noted a 2016 psychosexual evaluation of the father concluded he does not have a serious mental impairment and is treatable. The court continued the CINA adjudication with a long-term goal of establishing a safe relationship with both parents, and the court allowed L.F. to visit the father with full supervision and restrictions preventing the father from assisting L.F. with toileting, bathing, or dressing.

The juvenile court held a series of permanency review hearings and issued corresponding orders over the next several months.[4]  Beginning with the May 13, 2019 permanency order, the court allowed L.F. to visit the father at DHS's discretion.  DHS developed a safety plan that allowed for supervised visitation and largely kept the court's initial restrictions in place.  By the time of the final hearing on December 21, 2020, DHS primarily provided the safety plan and at least monthly meetings with the family.  DHS also allowed either the paternal grandmother or the father's live-in friend to supervise L.F.'s visitations with the father.  On December 21, the court issued its order dismissing the CINA action and closing the case.  The mother appeals.

**II. Standard of Review**

We review CINA proceedings de novo.  *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001).  "We review 'both the facts and the law, and we adjudicate rights anew.'"  *Id.* (quoting *In re H.G.*, 601 N.W.2d 84, 85 (Iowa 1999)).  "Although we give weight to the juvenile court's factual findings, we are not bound by them."  *Id*.  "As in all juvenile proceedings, our fundamental concern is the best interests of the child."  *Id*.

**III. Analysis**

The juvenile court may terminate a CINA dispositional order if it determines "[t]he purposes of the order have been accomplished and the child is no longer in need of supervision, care, or treatment."  Iowa Code § 232.103(4)(a) (2018); *see*

---

[4] Review hearings were held May 13, 2019; December 13, 2019; June 12, 2020; and December 21, 2020.  Orders were entered shortly after each hearing, with an order for termination of the dispositional order entered December 21, 2020.

*also K.N.*, 625 N.W.2d at 733. In the dispositional order here, the court found "appropriate protective services" are needed to protect L.F. from "imminent danger of sexual abuse while in her father's care and custody." The court set a goal of the CINA action as "establishing long-term safety for [L.F.] so that she can enjoy a safe and lasting relationship with her parents."

In dismissing this CINA action, the juvenile court found the father showed "growth and change" since the CINA adjudication. While we recognize the father has made progress, after our de novo review of the record, we conclude the same concerns about the father that prompted the CINA action continue to exist.

Throughout this CINA action, the father has sought to minimize and avoid responsibility for his sexual misconduct. In 2016, prior to the CINA adjudication, the father underwent a psychosexual evaluation. The evaluation generally determined the father's responses were within normal or acceptable ranges, but the evaluation also noted the father "has explanations that keep him from being able to accept that he is the one responsible for his sex deviance problem" and these explanations prevent "him from accepting full responsibility for his actions." Similarly, the juvenile court in the dispositional order found the father "rationalizes his behavior to minimize the seriousness of his sexual behavior and he holds the victims responsible." The father underwent another psychosexual evaluation in February 2019, which again found the father's responses within normal or acceptable ranges. However, this evaluation still found the father "has explanations which keep him from taking full responsibility for his sexual behaviors."

More recently, the father's therapist submitted two letters for this CINA action. In an October 2019 letter—which the juvenile court found is "entitled to substantial evidentiary weight"—the therapist wrote the father has shown "concerning behavior" and "has been reluctant to discuss certain things," but the father "has become more acutely aware of how he positions himself when interacting with others, particularly females."[5] The therapist also noted the father admitted to "boundary violations" with K.S. but has consistently denied he "intentionally or unintentionally abused his children for sexual gratification or to satisfy his curiosity." In a November 2020 letter, the therapist wrote the father continues working on "keeping safe boundaries" as the father believes "that due to his positive outlook on things[,] he doesn't always consider how his behavior might be considered questionable to outsiders."

During the final review hearing, the father testified therapy has helped him recognize "boundaries" with other people. When questioned about specific incidents of sexual misconduct, the father only vaguely replied that he "addressed all aspects in therapy." As the juvenile court found in the dispositional order, the father has shown a "striking and dangerous" pattern of sexual misconduct by "isolating" females—often minor females—"in a vulnerable position." This behavior goes far beyond merely violating "boundaries," and the father's refusal to fully acknowledge his misconduct remains highly concerning for this "very

---

[5] The therapist also noted the father believes the mother "is fueled by her hatred of him more than actual fear of him abusing the children." Despite never interacting with the mother or children beyond one session with L.F., the therapist spends considerable space in her letter negatively opining on the actions and motivations of the mother. While the therapist seemingly endorses the father's opinion of the mother, we place little weight on the therapist's opinion of the mother.

vulnerable" child. Our supreme court recently emphasized the importance for a parent to acknowledge the abuse that occurred before dismissing a CINA action. *See In re D.D.*, 955 N.W.2d 186, 193 (Iowa 2021) ("We find little comfort in the claim that therapy has achieved sufficient measures of protection and prevention when the primary agents of that protection and prevention—the mother and the stepfather—refuse to believe that any abuse ever occurred."); *see also In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002) ("A parent's failure to address his or her role in the abuse may hurt the parents' chances of regaining custody and care of their children."). Contrary to the juvenile court's finding that the father testified "without attempting to minimize or avoid the subject matter of the questions," we see no evidence in the record the father ever acknowledged any sexual misconduct directed at K.S., S.F., or L.F.[6] Instead, at the final hearing the father specifically testified he has "never been sexually inappropriate with" S.F. or L.F. S.F. also testified at the hearing that the father has repeatedly denied even crossing boundaries with her. While the juvenile court found the father credible in testifying that his motivation is L.F.'s best interests, we cannot overlook his consistent refusal to acknowledge or accept responsibility for his sexual misconduct.

L.F.'s limited ability to communicate and therefore self-protect is an additional concern. In the dismissal order, the juvenile court found L.F. "is able to communicate her wants, needs, desires, feelings and emotions" and "can

---

[6] We are cognizant the father cannot be required to incriminate himself as a condition of regaining care. *See C.H.*, 652 N.W.2d at 150 ("The State may not penalize [the father] for noncompliance with a court order impinging on his right against self-incrimination."). However, the father has not raised self-incrimination as a barrier to acknowledging the sexual misconduct. Additionally, some of the father's alleged acts or behavior would not constitute a crime.

communicate to others when something is wrong." This finding overstates L.F.'s ability to communicate as described by the uncontroverted testimony of the people who regularly work with her. One aide testified L.F. could express being uncomfortable or hurt but she could not communicate being a victim of abuse or identify who was previously in a room with her. Another aide testified L.F. could not communicate she was a victim of fondling. L.F.'s special education teacher testified L.F. could not communicate she was the victim of sexual abuse and she could not identify "bad touches." The June 2020 DHS report is consistent with this testimony, stating L.F. "relies on her caregivers to be safe and keep her safe from harm. [L.F.] requires supervision 100% of the time. She does not have the same protective capacities of other children her age." Thus, the record establishes L.F. remains particularly vulnerable because she cannot differentiate between "good" and "bad" touches, and she cannot effectively communicate a bad touch even if she recognized the difference. These limitations leave her unable to self-protect if faced with any additional sexual misconduct.

The juvenile court noted DHS involvement was minimal before it dismissed the CINA action. However, we do not believe DHS involvement was without value. DHS developed a safety plan that required full supervision and prevented the father from assisting L.F. with her most vulnerable activities. That plan from the June 2020 DHS report specifically provides:

> 1. [The father] will not toilet or assist [L.F.] with the toilet or changing her clothes or undergarments.
> 2. [The father] will not bathe or shower [L.F.].
> 3. [The father] will not undress or be in the same room where [L.F.] is in any state of undress

4. Under no circumstance shall [the father] occupy the same bed or sleeping arrangement as [L.F.] nor shall he lay with[,] "spoon," [or] "cuddle" with her.

5. [The father] will not be in any car, truck, vehicle, home, building or structure alone with [L.F.].

6. [The father] will not be in a room where the doors are closed, alone with [L.F.].

7. During overnights, [L.F.] will be at [the maternal grandmother's] home; [the father] will NOT sleep in the same home.

An approved supervisor will always be within earshot (50–60 feet) of [L.F] in order to identify if she has any concerns or needs.

DHS also provided monthly meetings with the family to assist with following the safety plan. Without the CINA proceeding, the applicable visitation provisions revert back to the decree of dissolution, which only requires supervision on L.F.'s overnight visitations with the father. While the father testified he will not engage in risky behavior with L.F. even without the DHS safety plan, ending DHS involvement is not appropriate at this time due to the father's refusal to acknowledge his sexual misconduct. Of critical importance is L.F.'s limited ability to recognize and communicate any sexual misconduct she experiences. Her "very vulnerable" status has not changed, and therefore her ability to self-protect remains the same as when this case began. While DHS's involvement and the juvenile court's oversight may be very limited, keeping the safety plan in place gives L.F. a level of protection she was not afforded in her parents' dissolution of marriage decree.

### IV. Conclusion

We recognize the father has dutifully participated in therapy. However, merely participating in therapy does not justify dismissing a CINA proceeding. *See D.D.,* 955 N.W.2d at 192–93 ("Progress in therapy and similar efforts to 'put the work in' are unquestionably important. But the statute doesn't ask whether all the

boxes have been checked or the work put in; it asks whether the child remains in need of supervision, care, or treatment."). We also recognize the father has not been accused of new sexual misconduct during the two-plus years of this CINA action, but as noted above, L.F.'s vulnerability remains the same.

Because the father continues to minimize and deny the sexual misconduct, and because L.F. has limited ability to recognize and communicate any sexual misconduct she may experience in order to self-protect, the purposes of the CINA adjudication have not been accomplished and L.F. remains in need of juvenile court supervision. Therefore, we reverse the juvenile court order dismissing the CINA action and remand for further proceedings. In light of our disposition, we do not address the mother's other arguments on appeal.

**REVERSED AND REMANDED.**